

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-13-2000

# Rose Art Industries, Inc. v. Swanson

Precedential or Non-Precedential:

Docket 98-6489

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Rose Art Industries, Inc. v. Swanson" (2000). *2000 Decisions.* Paper 249.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/249

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 13, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6489

ROSE ART INDUSTRIES, INC., a New Jersey Corporation;
WARREN INDUSTRIES, INC., an Indiana Corporation

v.

CARL SWANSON, an individual;
THE SWANSON GROUP, INC., a Delawar e Corporation;
RAYMOND GEDDES & COMPANY, INC., a
Maryland Corporation

      Rose Art Industries, Inc.,

      Appellant

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 98-cv-02263)
District Judge: Honorable Joseph A. Greenaway, Jr.

Argued September 10, 1999

Before: ROTH and WEIS, Circuit Judges
SHADUR,[1] District Judge

(Opinion filed: December 13, 2000)

_____

1. Honorable Milton I. Shadur, United States District Court Judge for the
Northern District of Illinois, sitting by designation.

Roslyn S. Harrison, Esquire (Argued)
Joseph F. Falgiani, Esquire
Joan T. Pinaire, Esquire
Nicholas Albano III, Esquire
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

 Attorneys for Appellant

Kathryn Miller Goldman, Esquire
 (Argued)
Donna M.D. Thomas, Esquire
Astrachan, Gunst, Goldman &
 Thomas, P.C.
20 South Charles Street, 6th Floor
Baltimore, Maryland 21201

 Attorneys for Appellee

OPINION OF THE COURT

ROTH, Circuit Judge:

The issue in this appeal is colorful. The appellant, Rose Art Industries, Inc. (Rose Art), claims that the appellee, Raymond Geddes and Company (Geddes), engaged in unfair competition in violation of section 43(a) of the Lanham Act. Specifically, Rose Art, a distributor of crayons, markers, and colored pencils, seeks to enjoin Geddes fr om distributing various stationery products (markers, crayons, and colored pencils) in packaging that Rose Art alleges infringes its trade dress.

The District Court held that Rose Art's packaging did not have a "consistent overall look" and thus did not constitute recognizable trade dress. The District Court denied Rose Art's motion for a preliminary injunction because it found that Rose Art had not demonstrated a reasonable probability of success on the merits.

We conclude that the District Court misapplied the legal standard in determining whether the characteristics of

2

three types of Rose Art's packaging constituted recognizable trade dress. We will reverse the District Court's denial of Rose Art's motion for a preliminary injunction and remand this case for further proceedings consistent with this opinion.

I. Facts

Rose Art Industries, Inc., a New Jersey corporation, has been manufacturing and selling stationery pr oducts, including crayons, colored pencils, and markers, for over sixty years. Rose Art is currently the second-largest seller in the United States of children's crayons, markers, and chalks.

Raymond Geddes and Company, a Maryland corporation, was founded in 1923 and originally sold novelty items. Geddes subsequently expanded its operations in or der to sell office supplies and stationery products to elementary school bookstores. Initially, Geddes did not have its own line of crayons. It purchased crayons fr om third parties, such as Crayola or Sargent, for resale to schools. In 1994, however, Geddes developed its own line of crayons called Spectrum, which it marketed and sold to elementary school bookstores in packaging designed by an independent designer.2

In 1996, hoping to expand its sale of stationery pr oducts into national mass merchandise retail outlets, Geddes hired Chris Blackmon as its national sales manager to develop mass market distribution channels for Geddes's pr oducts. Under Blackmon's direction, Geddes's Cr eative Director, Aleksandra Gulan, developed a product line under the name KidStuf 1. KidStuf 1 included markers and colored pencils, but not crayons.

In 1997, Geddes decided to further expand its mass market offerings by designing an art supply line, including a full range of markers, colored pencils, and crayons. Geddes targeted older children, ages 10-12, for its new line

_____

2. Engagement Manufacturing Company, a Taiwanese company that manufactured Rose Art's crayons, also manufactured Geddes's Spectrum crayons.

and named it "ARTiculates," suggesting a more sophisticated arts and crafts product. Because Geddes felt that the KidStuf 1 package design was not suitable for a mass market line, it decided to create a new package design for ARTiculates. Before cr eating the new design, Gulan and Blackmon obtained samples and catalogs of other manufacturers' retail stationery pr oducts, including Rose Art's.

Gulan completed the design of the ART iculates packaging in September 1997, in time for Geddes to show the new line at the industry trade show in November. The ARTiculates packaging was characterized by a yellow backgr ound with a contrasting bold, bright color illustration of the product on the box and the product type written in white letters on a black oval-shaped band. The ARTiculates package also featured the legend "since 1923" and the statement: "We invite your comments about our product. Please write to: Raymond Geddes & Company, Consumer Affairs, P .O. Box 24829, Baltimore, MD 21220." Both of these legends were new additions to the Geddes product design.

In July 1997, Dollar General Corporation (Dollar General)3 conducted its standard annual bid process. During the bid process, also known as a line review, Dollar General accepted bids from different manufacturers seeking to supply Dollar General with stationery products for 1998. Rose Art instructed its manufacturer repr esentative, Carl Swanson, to submit bids to Dollar General for Rose Art's products. Unbeknownst to Rose Art, Swanson was also Geddes's manufacturer representative. Rose Art alleges that Swanson failed to submit bids for a number of Rose Art's products but that he did submit bids to Dollar General on behalf of Geddes for its stationery products. 4

_____

3. Dollar General is a multi-billion dollar discount retailer with over 3,600 stores nationwide.

4. In its complaint, Rose Art asserted claims against Swanson and Geddes for misappropriation of Rose Art's trade secrets. Rose Art and Swanson have settled their claim. The only issue before the District Court on Rose Art's motion for a preliminary injunction was whether Geddes's packaging infringed Rose Art's trade dr ess.

4

In August 1997, Chris Blackmon and Swanson met with Gail Moore, the buyer for Dollar General's stationery department. At this meeting, Blackmon showed Moore the KidStuf 1 line of products. In a second meeting on October 2, 1997, Blackmon showed Moore some crayon and marker samples in the ARTiculates packaging. Moore expressed interest in Geddes's ARTiculates line but did not like the ARTiculates packaging because it was too wordy, busy, and dull. She told Blackmon that she was looking for a package that was more basic, simple, and colorful with a design that would appeal to younger children. Moore instructed Blackmon to create a package that looked more like Crayola's package.5 Blackmon agreed to provide Moore with a revised package design.

Based on Moore's directions, Blackmon instructed Gulan to redesign the ARTiculates packaging using the KidStuf name and modifying the package to make it brighter and simpler. The new design, which the parties refer to as KidStuf 2, consists of the following characteristics: a bright yellow background on the top half of the package with a bright contrasting color on the bottom, the product type in white letters on a black band in the middle of the package, a rainbow backdrop (referred to by the District Court as a "swish") on which the KidStuf mark is superimposed, the statement that the product is "Certified Non-Toxic," the legend "since 1923", and the statement "We invite your comments about our product. Please write to: Raymond Geddes & Company, Consumer Affairs, P.O. Box 24829, Baltimore, MD 21220."

On October 6, 1997, Geddes sent artwork, depicting the KidStuf 2 package design, to Dollar General. On October 10, Geddes sent forty-eight mock-up packages. The mock-ups comprised other manufacturers' crayon packages, including Rose Art's, with Geddes's KidStuf 2 package design wrapped around the other manufacturers' packages. The forty-eight Geddes mock-up packages were used by Dollar General in its planogram room (where the company

_____

5. Rose Art contends that Geddes must have been instructed to imitate Rose Art's packaging because the resulting package does not resemble Crayola's but rather Rose Art's.

5

displayed products as if they were on a shelf in a store) for review by Dollar General's executives in their selection of new vendors. In December 1997, after completing its standard annual bid process, Dollar General selected Geddes as its primary supplier of stationery pr oducts for 1998.

II. Procedural History

On May 20, 1998, Rose Art filed suit in U.S. District Court for the District of New Jersey, claiming unfair competition in violation of section 43(a) of the Lanham Act. Rose Art alleged that Geddes's KidStuf 2 packaging and its ARTiculates packaging were confusingly similar to Rose Art's packaging, especially Rose Art's Primary Color Packaging.

In an attempt to settle this litigation, Geddes in July of 1998 created a new package design for its stationery products (New Package Design). Geddes's New Package Design prominently displays the "Raymond Geddes" logo below the product's name. The box is characterized by a gold-yellow color on the top portion of the box and a contrasting purple-magenta color on the bottom; the product's type (e.g., crayons) is featur ed in white letters on top of a multi-tiered band of shades of blue. In addition, the New Package Design displays the products themselves either through a die cut, which reveals the markers or pencils, or through crayon illustrations, arranged in a rainbow design. Despite Geddes's efforts to settle, however, Rose Art now alleges that the New Package Design is also confusingly similar to Rose Art's packaging, especially the Rose Art Neon Color Packaging.

On August 3, 1998, Rose Art filed a motion for a preliminary injunction to stop Geddes fr om selling the alleged infringing packaging. The District Court denied the motion. See Rose Art Indus., Inc. v. Raymond Geddes & Co., 31 F. Supp. 2d 367 (D.N.J. 1998).

Rose Art claims on appeal that its trade dress for crayons, markers, and colored pencils is composed of the following elements: (1) a prominent band that is either straight or wavy and often black in color that cuts across

6

the middle of the front of the package, extending to the sides with the words "CRAYONS" or"WASHABLE MARKERS" or other descriptive term in white letters imprinted on the band (the "Band and Letter feature"); (2) a yellow background on the top of the package with a contrasting background color (either red, purple, pink, or a combination of purple fading to red) on the bottom of the package; and (3) a prominent display of the Rose Art logo in golden yellow (either foil or print) or r ed, either with or without a rainbow "swish" design behind the logo on the front of the package. In addition, in its pr esentation to the District Court, Rose Art included three other elements in its claim of infringement: (1) the statement "since 1923"; (2) the statement on the front of the package that the product is "Certified Non-Toxic;" and (3) the sentence inviting consumer comments, "Rose Art invites your comments and questions about this product. Please write to Rose Art Industries, Inc., Consumer Affairs, 6 Regent St., Livingston, NJ 07039 or call 1-800-CRAYONS."

Rose Art presents three differ ent subgroups of product packaging as recognizable trade dress: Rose Art Primary Color Packaging, Rose Art Neon Color Packaging, and Rose Art Color Fade Packaging. Rose Art seeks trade dr ess protection for each of these three subgr oups. Rose Art contends that its Primary Color Packaging is used to package traditional crayons, markers, and chalk pr oducts; it features the Band and Letter feature (with white letters over a straight or wavy black band), a yellow backgr ound on the top of the package, and a red or purple background on the bottom of the package with the Rose Art logo in golden yellow print or gold foil and rainbow "swish." Similarly, Rose Art contends that its Neon Color Packaging, as the name suggests, is used to package neon color crayons and scented, shaped, or "color change" markers; it features the Band and Letter feature (with white letters over a straight or wavy purple, pink or black band), a flourescent yellow background on the top of the package, and the Rose Art logo with the rainbow "swish" on the bottom emblazoned on a pink or purple backgr ound. Finally, Rose Art contends that its Color Fade Packaging,[6]

---

6. The Rose Art Color Fade Packaging was originally only used to package products sold at Wal-Mart.

7

which is used to package crayons, bold and classic markers, colored pencils, and modeling clay, features the Band and Letter feature, with white letters over a black band, the Rose Art logo in red letters above the band, a yellow background on the top of the package, and a color fade from purple to red background on the bottom. In addition, the packaging for colored pencils and some crayons displays the crayons or colored pencils on the bottom right hand corner of the package. Rose Art admits that some of its packages combine features fr om more than one of the three subgroups for which it seeks trade dress protection but claims that even those packages fall "clearly within the Rose Art Family Trade Dress."

Rose Art markets, advertises, and sells its pr oducts in many other package designs, as reflected in the materials gathered by Geddes for the preliminary injunction hearing (purchased either at Target, T oys "R" Us or KMart or from Rose Art's catalog). However, Rose Art contends that crayons, markers, and colored pencils packaged in Primary Color Packaging, Color Fade Packaging, and Neon Color Packaging constitute "the vast majority of its crayon[s], marker[s] and colored pencil[s]."

III. Discussion

A. Jurisdiction and Standard of Review

This action was filed by Rose Art pursuant to section 43(a) of the Lanham Act. Section 43(a) creates a federal cause of action for unfair competition and pr ohibits the sale of goods by use of

> any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, which––(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . ..

15 U.S.C. S 1125(a) (1999); see American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1140 (3d Cir. 1986).

8

The District Court had federal question jurisdiction pursuant to 28 U.S.C. S 1331. See 28 U.S.C. S 1331 (1999). We have appellate jurisdiction to review the District Court's interlocutory order denying a preliminary injunction pursuant to 28 U.S.C. S 1292(a)(1). See 28 U.S.C. S 1291(a)(1) (1999). We review the District Court's order denying a preliminary injunction under an abuse of discretion standard, its factual findings under a clear error standard, and its findings of law under a de novo standard. See NutraSweet Co. v. Vit-Mar Enter., Inc., 176 F.3d 151, 153 (3d Cir. 1999).

B. Background

The District Court determined that "Rose Art seeks trade dress protection not for the overall appearance of a single product, but rather for the overall look of a line of packaging for three products--crayons, markers and colored pencils." Rose Art Indus. Inc. v. Raymond Geddes and Co., 31 F. Supp. 2d 367, 373 (D.N.J. 1998). The District Court noted that the Third Cir cuit Court of Appeals had not addressed the plaintiff 's bur den in such a case, but acknowledged that the Second Circuit, Fifth Circuit, and district courts within the Second Circuit had recognized such trade dress protection.

The District Court held that a plaintiff seeking protection for a line of products, rather than a single pr oduct, must establish that the series or line of products for which it seeks trade dress protection has a "consistent overall look." See id. (quoting Walt Disney Co. v. GoodTimes Home Video Corp., 830 F. Supp. 762, 766 (S.D.N.Y . 1993)).

Applying the "consistent overall look" standar d to this case, the District Court concluded that "the variations in Rose Art's package design are not slight but rather represent a kaleidoscope of color combinations and design formats which fail to convey a `consistent overall look' to the consumer." Rose Art, 830 F .Supp at 376. Addressing each of the six elements asserted by Rose Art to be part of its trade dress, the District Court concluded that:

> Rose Art's trade dress varies so widely that consumers
> cannot conclude that the products come fr om one

9

> source. Accordingly, this Court concludes that Rose Art uses numerous different styles of packaging for its crayons, markers and colored pencils such that its packaging fails to present a "consistent overall look" and does not qualify for trade dress pr otection under the law.

Id. at 378.

The District Court ended its analysis with the finding of no consistent overall look, concluding that the Appellants had not demonstrated a reasonable probability of success on the merits.7 Since the r equirements of a trade dress infringement claim are conjunctive, the court did not analyze the remaining elements: (1) inher ent distinctiveness or secondary meaning, (2) non-functionality, and (3) likelihood of confusion.

C. Analysis

1. The Proper Legal Standard for Identifying Recognizable
      Trade Dress

The application of section 43(a) of the Lanham Act is not limited to trademarks. Section 43(a) also pr ovides protection to "certain words, symbols, collocations of colors and designs, or other advertising materials or techniques" that the purchasing public has come to associate with goods from a single source. R.J.R. Foods, Inc. v. White Rock Corp., 603 F.2d 1058, 1059 (2d Cir . 1979); see also Duraco Prods., Inc. v. Joy Plastic Enters., Ltd., 40 F.3d 1431, 1438 (3d Cir. 1994) (holding that section 43(a) of the Lanham Act protects trade dress).

Trade dress has been defined as the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique. See Two Pesos, Inc. v. Taco Cabana, Inc. 505 U.S. 763, 765 n.1 (1992).

---

7. The District Court did not address the other three components of the preliminary injunction standard.

Typically, in a trade dress action under section 43(a) of the Lanham Act, the plaintiff is requir ed to prove that "(i) the trade dress is distinctive, either because it is inherently distinctive or because it has acquired distinctiveness; (ii) the trade dress is nonfunctional; and (iii) the defendant's use of plaintiff 's trade dress is likely to cause consumer confusion." Duraco Prods., 40 F .3d at 1439. This three-part inquiry alone, however, is insufficient when the plaintiff in a trade dress action seeks protection under the Lanham Act for a series or line of products or packaging. As the Second Circuit Court of Appeals has noted, in contrast to a situation where the plaintiff is seeking protection for a specific package or a single product, "when protection is sought for an entire line of products, our concern for protecting competition is acute." Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 380 (2nd Cir. 1997); see also Regal Jewelry Co. v. Kingsbridge Int'l, Inc., 999 F. Supp. 477, 486 (S.D.N.Y. 1998) ("[C]ourts consider . . . broader product line claims with an `acute' concern for protecting competition given that any r emedy could potentially cover a wide range of products."). This concern led to the development of the "consistent overall look" standard.

In the first case to set forth the "consistent overall look" standard, Walt Disney Co. v. Good T imes Home Video Corp., 830 F. Supp. 762 (S.D.N.Y. 1993), the plaintiff sought protection not for a specific package or the appearance of a single product but for the overall appearance of a number of different packages. See id. at 766. The district court in Walt Disney, noting the distinction between Disney's claim and the typical claim in a single product trade dress action, stated:

> Disney has a burden which most plaintif fs alleging trade dress infringement do not need to carry. Disney must establish the existence of a recognizable trade dress. That is, Disney must establish that its videocassette packages have a consistent overall look. If established, this trade dress is entitled to protection under Lanham Act S 43(a) if it is distinctive, meaning capable of identifying Disney as the source of the videocassettes, and if GoodTimes' trade dr ess is likely

11

> to mislead consumers to believe that GoodTimes'
> Aladdin is the Disney version.

Id.

Rose Art argues, however, that the District Court applied the wrong legal standard when it applied the "consistent overall look" standard before it considered the black letter law standard of non-functionality, distinctiveness, and likelihood of confusion. Rose Art contends that the District Court should have required Rose Art to meet only the latter standard.

We are persuaded that the "consistent overall look" standard, set forth in Walt Disney and applied by the Second Circuit Court of Appeals in Landscape Forms and other cases, is the appropriate threshold inquiry in a trade dress case where the plaintiff seeks protection for a series or line of products or packaging. See, e.g. , Samara Brothers, Inc. v. Wal-Mart Stores, Inc., 165 F.3d 120, 125-27 (2d Cir. 1998), rev'd on other grounds, 120 S. Ct. 1339, 1345-46 (2000); Landscape Forms, Inc., 113 F .3d at 380-81; Innovative Networks, Inc. v. Satellite Airlines T icketing Ctrs., Inc., 871 F. Supp. 709, 722-23 (S.D.N.Y . 1995).8

Because of the broad reach that pr otection of trade dress for a series or line of products would embrace, we will require this more stringent test before the non-functionality/distinctiveness/likelihood of confusion test is applied. A plaintiff, seeking protection for a series or line of

_____

8. The District Court also cites Chevr on Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695 (5th Cir. 1981) and Keystone Camera Products Corp. v. Ansco Photo-Optical Products Corp., 667 F. Supp. 1221 (N.D. Ill. 1987) as cases that have applied the "consistent overall look" standard. While these cases ar e consistent with and provide support for such a standard, the "consistent overall look" standard was not articulated until 1993 in Walt Disney , 830 F. Supp. at 766; cf. Chevron, 659 F.2d at 697 (describing the Ortho packaging used for "125 law and garden products in a `uniform' family trade dress"); Keystone, 667 F. Supp. at 1229 ("Before analyzing secondary meaning, confusion and functionality, this court must . . . pause to consider whether Keystone has a protectable trade dress for its cameras which bear clashing, contrasting, multiple color combinations with a distinctive dot pattern.").

12

products, must first demonstrate that the series or line has a recognizable and consistent overall look. Only after the plaintiff has established the existence of r ecognizable trade dress for the line or series of products should the trial court determine whether the trade dress is distinctive, whether the trade dress is nonfunctional, and whether the defendant's use of plaintiff 's trade dr ess is likely to cause consumer confusion. As such, we hold today that the District Court applied the correct legal standard when it required Rose Art first to show that the three packaging designs at issue, Primary Color Packaging, Neon Color Packaging, and Color Fade Packaging, each had a "consistent overall look." We agr ee with the District Court that "if a plaintiff seeking trade dr ess protection cannot show that its packages have a `consistent overall look,' the trade dress that the defendant is allegedly infringing `does not exist,' " and the defendant must pr evail. Rose Art, 31 F. Supp. 2d at 374.

In endorsing the "consistent overall look" standard, however, we do not require that the appearance of the series or line of products or packaging be identical. As the District Court stated "a party may have trade dr ess rights even though there are slight variations in its package design so long as the change does not alter the distinctive characteristics and the trade dress conveys a single and continuing commercial expression." See id. at 373 (citing Beech–Nut Packing v. Lorillard Co., 229 F . Supp. 834, 849–50 (D.N.J. 1924), aff 'd 7 F.2d 967 (3d Cir. 1925), aff 'd 273 U.S. 629 (1927)).

2. The District Court's Application of the Consistent Overall Look Standard

Rose Art next contends that the District Court impr operly applied the "consistent overall look" standar d in this case; that it erred as a matter of law by considering products not at issue. Rose Art is seeking trade dress pr otection only for its Primary Color Packaging, Color Fade Packaging, and Neon Color Packaging. The District Court, however , considered products beyond these pr oduct lines to support its conclusion that each of these Rose Art pr oduct lines did not have a "consistent overall look."

13

As a preliminary matter, the plaintiff in a trade dress action under section 43(a) of the Lanham Act is free to seek trade dress protection for whatever products or packaging it sees fit. A plaintiff can seek trade dress protection either for a single product or for a whole line of products. See, e.g., Ideal Toy Corp. v. Plawner Toy Mfg. Corp., 685 F.2d 78, 79 (3d Cir. 1982) (single product); Regal Jewelry, 999 F. Supp. at 481 (S.D.N.Y. 1998) (line of products). Moreover, in seeking protection for the trade dress of a line of products, the plaintiff can define the line as it sees fit. In addition, there is nothing to constrain a plaintiff from seeking protection for several different lines of products (or of the packaging of those products). In presenting a case for trade dress infringement, a plaintiff can group together any number of products in any way it sees fit, as long as the products have a consistent overall look.

Here, Rose Art has alleged trade dress infringement of three distinct package designs: its Primary Color Packaging, its Color Fade Packaging, and its Neon Color Packaging. The District Court, however, in determining whether the packaging of these three product lines constituted recognizable trade dress (that is, whether the packaging had a "consistent overall look") considered product packaging outside the Primary Color Line, the Color Fade Line, and the Neon Color Line.

The District Court, to support its conclusion that Rose Art had not established the existence of recognizable trade dress, found that "certain packages of Rose Art crayons do not have a yellow background on the top of the package" and thus found lacking a critical element of Rose Art's alleged trade dress. Rose Art, 31 F. Supp. 2d at 376. However, one of the crayon packages referred to by the District Court was the Glow Crayons package with a black background on the top half;[9] Glow Crayons are not a part of the Primary Color Line, the Color Fade Line, or the Neon Color Line. Similarly, in concluding that Rose Art used eight different background color combinations as a part of

_____

9. During the preliminary injunction hearing, Rose Art specifically stated that it would be willing to abandon efforts to protect the packaging of its
glow-in-the-dark crayons.

14

the trade dress it is seeking to protect, see id., the District Court considered products not within the designated lines: glow crayons, glitter and brilliant color crayons, and fluorescent, glitter and superscented crayons. In addition, in concluding that all Rose Art packages do not use the Band and Letter Feature, see id., the District Court considered products not within the designated lines: Super Box of Crayons, Super Jumbo Crayons, Pre-School Crayons, Super Rainbow Pack, and Washable Markers in a bucket. Finally, in concluding that Rose Art used eight different colors for its Band and Letter Feature, see id., the District Court again considered products not within the designated lines, including washable markers and glitter and brilliant crayons.

In addition to considering products not within the designated lines, the District Court consider ed designated products that were packaged in dif ferent types of boxes. The District Court pointed out that Rose Art used multiple package designs for the same product. For example, washable markers and classic colors were packaged using different package designs, see id. at 378; traditional crayons were packaged in the Primary Color Packaging with a yellow background on the top half of the package and the Rose Art logo with the rainbow swish on the bottom in front of a red or purple background but they wer e also packaged in a box with a red background on top, a yellow background on the bottom and the Rose Art logo displayed on the upper left hand corner of the box, superimposed on a triangle. See id. at 376. Scented markers were packaged in the Neon Color Packaging with the rainbow swish on the bottom of the package but the rainbow swish did not appear on all packages of scented markers. The District Court concluded that this use of other types of packaging for designated products undermined Rose Art's claim of recognizable trade dress.

The District Court's reasoning in this r egard is flawed. The fact that Rose Art uses a variety of packages for a product such as traditional crayons would be fatal to Rose Art's case if Rose Art claimed that all traditional crayons were packaged in Rose Art's Primary Color Packaging, but Rose Art makes no such claim. Certainly the fact that Rose

15

Art packages the same product in several different types of packaging does not prevent Rose Art from seeking trade dress protection for one of these packaging designs.10

If Rose Art distributed three different lines of crayons, each line having its own distinctive packaging, and if the packaging of each line has its own "consistent overall look," then the packaging of each line would constitute recognizable trade dress regardless of whether the packaging of the three lines together have a "consistent overall look" and regardless of whether some crayons were packaged in other types of packaging. Even if Rose Art distributed the same products, for example, generic crayons, markers, and colored pencils in fifteen different package designs for each of fifteen different customers, this fact alone would not prevent Rose Art from obtaining trade dress protection for one of the fifteen different packaging styles. One or more of the package designs could be recognizable trade dress as long as it had a "consistent overall look." If, however, we were to follow the District Court's logic, a manufacturer or distributor would not be able to seek trade dress protection unless all its packaging had a "consistent overall look," regardless of whether the individual line had a "consistent overall look." This standard is legally untenable.11

We conclude that when applying the "consistent overall look" standard, that is, when determining whether the trade dress alleged by the plaintiff is recognizable, protectable trade dress, a trial court should consider only

_____

10. To use a more familiar example, Coca-Cola bottles would certainly be, at a minimum, recognizable trade dress despite the fact that Coca-Cola is also packaged in cans and that the design of a Coca-Cola bottle in no way resembles the design of a Coca-Cola can.

11. A simple analogy may be helpful: If a hypothetical company that produced three products (one with red packaging, one with blue packaging, and one with white packaging) sought trade dress protection for the product packaged in red, it would almost certainly be able to show that the red packaging was recognizable trade dress as defined by the "consistent overall look" standard used in the Second Circuit and adopted by us today, even if the three different types of packaging together did not have a "consistent overall look." Counsel for Geddes rightly conceded this point at oral argument.

16

the products or packaging for which the plaintiff is seeking trade dress protection. See Regal Jewelry, 999 F. Supp. at 486-90 (determining whether alleged trade dr ess had a consistent overall look by evaluating only the six novelty items at issue despite the fact that the plaintif f distributed almost 200 different novelty items).

The proper question is not whether Rose Art has consistently applied one trade dress to its packages of crayons, markers, and colored pencils, but rather whether Rose Art's Primary Color Packaging, Neon Color Packaging, and/or Color Fade Package each individually has a "consistent overall look."12 As such, we also hold today that when a plaintiff seeks trade dress pr otection under section 43(a) of the Lanham Act for multiple product lines or packaging, a District Court should evaluate each of the lines separately. In this case, for example, in determining whether Rose Art's Primary Color Packaging has a "consistent overall look," the District Court should consider this line alone, independently of the other lines for which Rose Art seeks trade dress protection.

IV. Conclusion

Because the District Court misapplied the "consistent overall look" standard, we will reverse the District Court's denial of Rose Art's motion for a preliminary injunction and

_____

12. In considering the trade dress implications of the fact that Rose Art markets the same product in differ ent packages, we are not concerned by the existence of different styles of packaging. If a manufacturer chooses to seek trade dress protection for too insignificant a line of products, the manufacturer may pass the"consistent overall look" test but then founder on distinctiveness or likelihood of confusion. The temptation to define too thinly, therefor e, is not without its own inherent
limitations.

We also note that the District Court's statement that "Rose Art's trade dress varies so widely that consumers cannot conclude that the products come from one source," while per haps consistent with or a proxy for the District Court's conclusion that Rose Art's alleged trade dress did not have a "consistent overall look," is strikingly similar to the third part of
a section 43(a) claim--whether consumers ar e likely to confuse the source of the plaintiff 's product with that of the defendant's product.

17

remand this case for further proceedings consistent with this opinion.13 On remand, the trial court should determine whether each of the three packaging designs for which Rose Art seeks trade dress protection, the Primary Color Packaging, the Color Fade Packaging and the Neon Color Packaging, has a "consistent overall look." If on remand, the District Court determines that one or mor e of these packaging designs does have a "consistent overall look" and thus constitutes recognizable, protectable trade dress, the District Court should then, in the context of evaluating Rose Art's request for a preliminary injunction, determine whether the trade dress is distinctive, either because it is inherently distinctive or because it has acquir ed distinctiveness, whether the trade dress is nonfunctional, and whether Geddes's use of Rose Art's trade dr ess is likely to cause consumer confusion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

---

13. We express no opinion concerning the merits of the plaintiff's claim, that is, whether the Primary Color Packaging, the Color Fade Packaging, or the Neon Color Packaging constitutes recognizable, protectable trade dress, is distinctive, is non-functional, or is likely to cause consumer confusion.